# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
December 17, 2012

Lyle W. Cayce
Clerk

No. 11-30345

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GREGORY MCRAE; DAVID WARREN,

Defendants - Appellants

No. 11-30529

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

TRAVIS MCCABE,

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

No. 11-30345

This case tells one of the nightmarish stories that arose from Hurricane Katrina in 2005—the physical devastation, human diaspora, and struggle of the City to maintain some semblance of law and order, and, in the chaos, a horrific failure of law enforcement. The case also demonstrates again the axiom that a cover-up, with its domino effect, begets more tragedy than the crime. It indeed presents a grim vignette within the larger Katrina story, told here in terms of legal consequences.

The three appellant former policemen were convicted in the same trial—conducted from November 8 to December 9, 2010—largely on separate facts but all arising from the death of one citizen, Henry Glover. Thus, this opinion will set out the facts and the issues raised on appeal in three separate parts.

The jury convicted David Warren, a former officer in the New Orleans Police Department ("NOPD"), of one count of depriving Glover of his right to be free from the use of unreasonable force by a law enforcement officer, in violation of 18 U.S.C. § 242, and one count of carrying, using, and discharging a firearm in furtherance of a felony crime of violence resulting in an individual's death, in violation of 18 U.S.C. §§ 924(c) and (j). The district court imposed a sentence of 189 months of imprisonment on the first count of conviction and 120 months on the second count of conviction, to run consecutively, for a total term of imprisonment of 309 months. Warren challenges his convictions and sentence on various grounds. We hold that, because Warren has demonstrated that he suffered specific and compelling prejudice as a consequence of the district court's refusal to sever his trial from that of the other defendants, the district court abused its discretion in denying Warren's repeated motions to sever under Federal Rule of Criminal Procedure 14(a). As a result, we VACATE Warren's convictions and sentences and REMAND for a new trial.

No. 11-30345

The jury also convicted Gregory McRae, another former NOPD officer, of one count of depriving William Tanner of the right to be free from an unreasonable seizure by a law enforcement officer, in violation of 18 U.S.C. § 242, one count of denying Glover's descendants and survivors the right of access to courts to seek legal redress for a harm, in violation of 18 U.S.C. § 242, one count of obstruction of a federal investigation, in violation of 18 U.S.C. § 1519, and one count of use of fire to commit a felony, in violation of 18 U.S.C. § 844(h). The district court imposed concurrent sentences of 87 months for each of the convictions under 18 U.S.C. §§ 242 and 1519, and a consecutive 120-month sentence for the conviction under 18 U.S.C. § 844(h), for a total of 207 months of imprisonment.  McRae challenges his convictions under 18 U.S.C. §§ 242 and 1519 on various grounds and his sentence under 18 U.S.C. § 844(h) on double jeopardy grounds.  We hold that the evidence is insufficient to support McRae's conviction for denying Glover's descendants and survivors the right of access to courts, and we therefore REVERSE and VACATE that conviction.  We AFFIRM McRae's other convictions, reject his double jeopardy challenge, and REMAND for re-sentencing.

Finally, the jury convicted Travis McCabe, a third former NOPD officer, of one count of obstruction of a federal investigation, in violation of 18 U.S.C. § 1519, one count of making false statements to the FBI, in violation of 18 U.S.C. § 1001, and one count of making false statements to a grand jury, in violation of 18 U.S.C. § 1623.  The district court later vacated these convictions and granted McCabe a new trial because of newly-discovered evidence.  In McCabe's case, the government appeals.  We hold that the district court did not abuse its discretion in granting McCabe a new trial, and we therefore AFFIRM that order.

No. 11-30345

## I.

## A.

Thus, once again, we have cause to revisit the effects on human life wrought by Hurricane Katrina. Briefly, the storm made landfall over the Louisiana coast due east of New Orleans at approximately 6:00 AM on Monday, August 29, 2005. Although the City of New Orleans weathered the storm, for the most part, intact, the subsequent breaches of levees surrounding the City caused devastating flooding and resulted in widespread destruction of property, loss of human life, and evacuation of the City.

## 1.

At the time, David Warren was a rookie patrol officer with the NOPD, having graduated from the police academy in May 2004. Although Warren was not scheduled to be on duty at the time of the hurricane's projected landfall, because he was unsure whether he would be able to return to the City and report for duty, he stayed at his home in the Algiers section of the City during the storm, while his family evacuated to safety. Once the storm passed, Warren attempted to report to work at the Seventh District station in east New Orleans—his assigned district—but that area of the City had suffered devastating flooding. Instead, Warren reported to the Fourth District, which was the district in which his residence was located in Algiers. That area of the City, on the west bank of the Mississippi River, had suffered considerably less flooding because of its higher elevation. From the time he first reported to duty until Friday, September 2, 2005—the day of the wretched and ghoulish events of this prosecution—Warren testified he was assigned various duties, ranging from roving patrols to guarding certain locations and businesses in the Fourth District. Officers were working twelve-hour shifts during those days. When not on duty, Warren testified that he patrolled his own neighborhood, which had experienced looting.

4

On September 2, 2005, Warren reported to the Fourth District station at 6:00 AM to receive his assignment for that day. He and Officer Linda Howard were assigned to guard the offices—or substation—of the Fourth District's District Investigative Unit ("DIU") at a shopping center on General De Gaulle Drive. The DIU offices, which had been damaged during the storm, contained the papers and files of the detectives of the Fourth District. Warren and Officer Howard left the Fourth District station and headed to the shopping center, stopping first at Warren's residence.

After arriving at the shopping center, Warren and Officer Howard took a brief tour downstairs and then walked upstairs to the DIU offices. The front of the shopping center looks onto General De Gaulle Drive; the back of the shopping center looks onto a parking lot that abuts Seine Street, which runs parallel to General De Gaulle Drive. Texas Drive intersects Seine Street and General De Gaulle Drive. Officer Howard testified that the gates on the first and second floors breezeways, which looked out onto the back parking lot area, were locked with chains. Warren testified that neither gate was locked, and that he, in fact, went out on the balcony on the second floor overlooking the back parking lot when they first arrived at the shopping center.

Approximately thirty minutes after their arrival, Warren and Officer Howard noticed a man on a bicycle riding up and down the area in the front of the shopping center. At this point, four days removed from Hurricane Katrina's landfall, the city was nearly deserted due to the mandatory evacuation orders. Warren testified that the man kept gazing in their direction, and after he bicycled up the street the fifth time, Warren fired a warning shot in the man's direction with his personal rifle, which Warren had been carrying with him on duty since the storm passed. He testified that, because it was merely a warning shot, he did not aim anywhere near the man.

5

At some point later, Warren heard noises coming from the back of the shopping center. He testified that he walked through the gate and onto the back balcony to see from where the noise was originating. He saw two females, later identified as Brandie Williams and her sister-in-law Katherine, pushing a shopping cart, filled with suitcases, from the rear entrance of the Tuesday Morning store in the shopping center. Warren asked the women if that was their property in the shopping cart. They responded no, prompting Warren to order them to leave the cart and exit the area. The women obeyed his order and left the area.

On their way back to nearby apartments, the two women ran into Glover and Bernard Calloway. Williams had been staying with her cousin Mickey and Glover, who was Mickey's boyfriend, in their apartment. Calloway was the boyfriend of Glover's sister, Patrice Glover; they too lived in nearby apartments. Without running water, electricity, or food, the family had decided that morning to evacuate. Williams testified that, during their conversation, she asked Glover and Calloway if they would go to the shopping center parking lot and retrieve the stolen items she had left in the shopping cart. Glover and Calloway agreed, according to Williams, and set off for the nearby parking lot.

Shortly after the women left the parking lot, Warren and Officer Howard were upstairs in the breezeway area when they again heard loud noises coming from the back parking lot. As to the events that followed, this much is undisputed: Warren shot at Glover with his personal rifle; Warren stated at the time of the shooting that he did not believe that he had hit Glover with the shot; and Glover was transported from the spot where he collapsed on Seine Street, by William Tanner in a white car—with Calloway and Glover's brother, Edward King, accompanying him—to nearby Habans Elementary School to obtain medical assistance for Glover because the nearest hospital was twenty minutes away.

6

No. 11-30345

With respect to the events surrounding the shooting itself, the jury was presented with multiple conflicting versions of the events.

2.

Warren testified that he ran to the back balcony area and observed a Firestone-store marked pick up truck, which he assumed had been stolen, come to a hard, fast stop. When both the passenger, later identified as Glover, and the driver of the truck, later identified as Calloway, exited the car, Warren testified he became concerned by their presence and shouted, "Police, get back." Instead of heeding the command, Glover and Calloway, according to Warren, began charging toward the unlocked gate on the first floor. Warren further testified that he believed Glover, who was ahead of Calloway, had a weapon in his right hand or was moving his hands toward his waistband as they charged the unlocked gate. According to Warren, he became concerned that, if Glover and Calloway came through the unlocked gate on the first floor, he would have to expose himself to imminent danger in hunting them down in the shopping center. He testified that he did not understand why Glover and Calloway refused to heed his command to stay back; he presumed they did not care about his order. Thus, he felt threatened for his safety and that of his partner if they reached the unlocked gate. According to Warren, at the time he fired the shot, Officer Howard was a bit behind him and, because of the structure of the shopping center, she would not have been able to see what Warren was viewing at the time he fired the single shot.

When Warren fired a shot from his rifle at Glover, Glover and Calloway immediately veered off and ran down Seine Street. Neither man indicated in any way that Glover had been shot and Warren believed he had not hit Glover. Warren points out that a later search of the area revealed no blood in the parking lot. After Glover and Calloway ran from the scene, Officer Howard suggested that a ranking officer be called. Warren testified that he agreed.

7

Officer Howard called her supervising officer, Sergeant Purnella Simmons, who, along with Officer Kayaleah Bell, responded to the scene within minutes of the call. According to Warren, Sergeant Simmons first spoke with Officer Howard. Sergeant Simmons then spoke to him, and he told her what happened. Sergeant Simmons said that, upon her arrival, Warren related to her that he had issued a verbal command to Glover and Calloway; that he had fired only one shot; that he had run off looters from the shopping center earlier in the day; and that he believed he had seen an object in Glover's hand as he approached the shopping center.

While they were talking, a call came over the police radio about an aggravated battery by shooting at the nearby Habans Elementary School. Sergeant Simmons and Officer Bell left for that location without conducting any further investigation. Warren testified that, at the time, he thought there may have been some connection between what had transpired at the shopping center and the call from Habans Elementary School based on the close proximity in time but heard nothing more that day about the matter. Sergeant Simmons and Officer Bell returned to the shopping center approximately thirty minutes to an hour later. Warren testified that, when Sergeant Simmons asked if he could work the rest of the day, he responded affirmatively. Warren worked the rest of the shift with Officer Howard that day; he testified that she was neither hysterical nor crying, and, in fact, that they even had shared a meal later in the shift.

3.

The jury was presented with two different versions of Officer Howard's statement of the events that unfolded at the shopping center. During cross-examination, the jury learned that, on April 18, 2009, Officer Howard had given a statement of the events to NOPD Homicide Sergeant Dugue in which she confirmed that she had not seen the actual shooting. She had related to

Sergeant Dugue that she and Warren had been chatting when she heard mumbling or talking in the back parking lot. She went to the back balcony area and saw two men in the parking lot. She told Warren what she had seen and he went to the back balcony. She described to Sergeant Dugue that she heard a gunshot a few moments later, prompting her to run to the back balcony area where she saw a man lying down or ducking. She then ran to the front of the breezeway to see if anyone was in the front of the shopping center, but retreated to the back balcony area after seeing no one in the front of the shopping center. By that point, both men were gone. When asked by Sergeant Dugue whether she discussed what had occurred with Warren, Officer Howard could only remember contacting Sergeant Simmons but could not remember what happened when Sergeant Simmons arrived on the scene. She told Sergeant Dugue that she could not remember anything about the men; to her, everything was "just like shadows."

When Officer Howard testified at trial, however, she said that, after Warren had ordered Williams and her companion to leave the back parking lot area, she and Warren were upstairs when they heard a screeching sound from truck tires. She testified that she looked through the breezeway onto the back parking lot area and saw the Firestone-marked pick up truck drive up Seine Street before it pulled into the parking lot. According to Officer Howard, she and Warren both watched as Glover and Calloway jumped out of the truck and approached the shopping cart. Officer Howard testified that Warren then shouted something, a "loud command" "telling them to get away from there." Officer Howard described Glover and Calloway as startled by the command, as if they did not know someone was at that location. Scared by Warren's command, according to Officer Howard, the two men began running away, but not before Warren positioned himself next to Officer Howard, leveled his personal rifle, and fired a shot. Contrary to Warren's account, Officer Howard

testified that she never saw any object in Glover's hand or any motion to his waistband. She further testified that neither man made any movement toward the first floor gate that caused her to be concerned.

According to Officer Howard's testimony, Glover initially fell like he was hit by the shot, but then ran down Seine Street away from the shopping center until he collapsed on the ground. She testified that she could see from her vantage point at the shopping center that someone was holding Glover's head. Shortly thereafter, she watched a group of people place Glover's body in a white car, which then drove away from the scene. Crying and hysterical, Officer Howard testified that she contacted Sergeant Simmons, to whom she related her version of the events when Sergeant Simmons arrived on the scene with Officer Bell. Officer Howard also testified that she had indicated to a ranking officer later that day that it was not a "good" shooting.

In December 2005, Sergeant Simmons was assigned to write a report of the shooting for the NOPD. Officer Howard testified that she related the same version of the events for Sergeant Simmons's report as she did at trial.[1] Officer Howard did not discuss the shooting again until her April 2009 interview with Sergeant Dugue. During her cross-examination, however, she admitted that the account of the shooting she related to Sergeant Dugue during the April 2009 interview was "completely different" from the account of the shooting to which she had just testified on direct. To account for the significant contrary accounts, Officer Howard excused the contradictions because she had been sleepy and

---

[1] As will be discussed herein, the version of the narrative report containing Officer Howard's inculpatory statements about the shooting–the "first report"–was not produced by the government at trial, if in fact it ever existed at all. The "second report," which was alleged by the government to have been fabricated by McCabe to exonerate Warren, states that Officer Howard saw the Firestone-marked pick-up truck and observed two black males exit the pick-up truck and hurriedly approach the rear gate of the building, but that she "was in a different position on the balcony and was unable to observed [sic] all that Officer David Warren observed prior to him discharging his firearm."

No. 11-30345

under the influence of Benadryl at the time of her interview with Sergeant Dugue. She testified, moreover, that she had mentally suppressed many of the details of that day. After visiting the shopping center several days after the interview with Sergeant Dugue, however, she began having "flashbacks" and certain details of the incident became clarified. She testified that she contacted Sergeant Dugue and arranged another interview with him, during which she related the version of events to which she had testified on direct examination, thus contradicting the April interview; however, she said he did not record her statement that day.

4.

Calloway testified that, on the morning of September 2, he and Glover went to retrieve the items Williams said she had left in the shopping cart. He stated that Glover, who experienced difficulty in operating the Firestone-marked pick up truck's manual drive transmission, backed the truck up to the shopping cart in the parking lot. Calloway explained that he then exited the truck, walked to the shopping cart, and tried to pick up the first suitcase but it was heavier than he expected. He testified that, as he looked up to say something to Glover, who was leaning against the truck and about to light a cigarette, he heard a "pow" and then a voice that stated, "Leave now." Calloway ran immediately in response. At some point, he looked behind him and saw Glover stumbling. Calloway testified that he ran back to Glover, who by that point had collapsed on the ground. Eventually, help arrived when William Tanner offered to take Glover, Calloway, and King in his car to obtain medical attention for Glover. They placed Glover's body in Tanner's car and decided to go to the nearby Habans Elementary School, where Tanner knew the NOPD had set up a compound.

No. 11-30345

5.

Warren continued to serve as an officer with the NOPD for three additional years after the events of September 2, 2005, until financial circumstances required that he resign from the department to find work as an engineer. He thereafter served as a reserve officer until June 2010, when he was arrested on the instant offenses. On September 27, 2010, a federal grand jury returned an eleven-count second superseding indictment[2] in which Warren was charged in Counts One and Two. Count One charged Warren with willfully depriving Glover of his right to be free from the use of unreasonable force by a law enforcement officer acting under color of law and without legal justification, in violation of 18 U.S.C. § 242.[3] Count One also charged that the offense involved the use of a dangerous weapon, and an attempt to kill, and resulted in bodily injury to, and the death of, Glover. Count Two charged Warren with knowingly using, discharging, and carrying a firearm during and in relation to, and possessing a firearm in furtherance of a felony crime of violence, to wit: the commission of the civil rights offense charged in Count One. Count Two further charged that Warren caused the death of Glover through the use and discharge

---

[2] The grand jury returned an eleven-count indictment on June 11, 2010. A superseding indictment was returned on August 6, 2010.

[3] Section 242 provides, in relevant part:

Whoever, under color of any law . . . willfully subjects any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include . . . an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 242.

12

of the firearm, and that Glover's death involved circumstances constituting murder as defined in 18 U.S.C. § 1111, all in violation of 18 U.S.C. §§ 924(c)[4] and (j).[5]

Warren repeatedly moved before, during, and at the conclusion of the trial, for severance of his trial from that of his co-defendants based on improper joinder under Federal Rule of Criminal Procedure 8(b) and prejudicial joinder under Federal Rule of Criminal Procedure 14(a). The district court denied the motion each time, opting instead to provide limiting instructions to the jury. A month-long jury trial followed in November 2010. At the end of evidence, the district court indicated its intent to charge the jury both as to murder and manslaughter with respect to 18 U.S.C. § 924(j), notwithstanding that Count Two of the indictment did not include a manslaughter charge, and that Warren strenuously objected to the proposition. The government initially had no position, but ultimately requested that the court instruct the jury with respect to voluntary manslaughter as defined in 18 U.S.C. § 1112 for purposes of 18 U.S.C. § 924(j).

---

[4] Section 924(c) provides, in relevant part:

[A]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . (I) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years. . . .

18 U.S.C. § 924(c)(1)(A).

[5] Section 924(j) provides:

A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and (2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.

18 U.S.C. § 924(j).

No. 11-30345

The jury convicted Warren of depriving Glover of his right to be free from the use of unreasonable force by a law enforcement officer, in violation of 18 U.S.C. § 242. The jury found that the offense resulted in Glover's death and that the offense involved an attempt to kill. The jury also convicted Warren of carrying, using, and discharging a firearm in furtherance of a crime of violence resulting in an individual's death, in violation of 18 U.S.C. §§ 924(c) and (j). For purposes of § 924(j), the jury found that the offense did not constitute murder as defined in 18 U.S.C. § 1111 but that the offense did constitute voluntary manslaughter as defined in 18 U.S.C. § 1112. The district court overruled Warren's challenge to the constitutionality of § 924(c)'s application to law enforcement officers. The court sentenced Warren to 189 months of imprisonment on the § 242 conviction and 120 months on the §§ 924(c) and (j) conviction, determining that the sentences should run consecutively, for a total term of imprisonment of 309 months. Warren timely appeals.

B.

1.

After Glover collapsed on the street, some of his friends and family made their way to the scene and gathered around him. Tanner appeared on the scene and offered to take Glover in his car to obtain medical assistance. Instead of taking Glover to a hospital, Tanner drove to Habans Elementary School, where the NOPD Special Operations Division maintained a temporary base. At trial, Tanner testified that he drove to Habans Elementary School because it was closer than any hospital, and he thought that Glover would receive medical assistance there.

Tanner, King, and Calloway arrived at Habans Elementary School in Tanner's car with Glover's body in the backseat. They were not so warmly greeted by a swarm of police officers and impolitely ordered at gunpoint to exit the car. A verbal and physical altercation ended with Tanner, King, and

14

No. 11-30345

Calloway in handcuffs, sitting on the ground.[6]  During this altercation, King stated either that he intended to shoot whoever shot his brother or kill whoever killed his brother, depending on whose recollection of the events one credits.  The fatally wounded Glover remained silently in the backseat of Tanner's car, and no one rendered Glover medical assistance.  The police officers, to the extent it was on their minds, apparently thought that Glover was already dead.  He may have been.

After the police officers subdued Tanner, King, and Calloway, Officer McRae moved Tanner's car to the schoolyard.  McRae removed several items from the car, including a gasoline jug, jumper cables, and tools.  Later, McRae moved Tanner's car to another area of the school property.  Glover remained in the car, which was to become his coffin.

Captain Jeffrey Winn, who was responsible for the NOPD Special Operations Division, was not present at Habans Elementary School when Tanner, King, and Calloway arrived.  He arrived at the school later and, after assessing the situation, instructed Officers Scheuermann and McRae to move Tanner's car, with Glover's body, to a more secure location away from the school.  Scheuermann and McRae were to park the car at a location north of the school, over a levee near the Mississippi River, close to a police station and a United States Border Patrol office.

McRae and Scheuermann left the school in different cars.  McRae drove Tanner's car and Scheuermann followed behind in a gray pick-up.  McRae arrived at the levee shortly before Scheuermann.  He drove Tanner's car over the levee and down a ramp, into an area of trees.  He got out of the car, lit a road flare, tossed the flare into the car, closed the driver's side door, and walked away. As McRae walked back up the levee to join Scheuermann in the gray pick-

---

[6] Tanner and King testified that the officers physically assaulted them, as well as directed degrading racial slurs toward the three men, who are all black, during the altercation.

15

No. 11-30345

up, he looked back and noticed that the flare was dying out. He walked back closer to the car, drew a pistol, and fired one shot into the car's rear glass. The shot ventilated the car. The car, with Glover's body, began to rapidly burn. The job was complete. McRae retreated to the gray pick-up.

When McRae got into the gray pick-up, Scheuermann asked him why he had set Tanner's car on fire. McRae responded that he "wasn't going to let it rot," referring to Glover's body. At trial, McRae testified that he decided to burn Tanner's car and Glover's body before he left Habans School, and that he made that decision on his own without consulting anyone. He testified that he had seen other dead bodies rotting in the chaotic aftermath of Hurricane Katrina, and that he did want Glover's body to suffer the same fate.

Two weeks later, Glover's charred remains were recovered and taken to a temporary morgue. A coroner performed an autopsy on the remains in late October 2005, but they were not identified as those of Glover until April 2006. Glover's family was then able to bury him.

2.

McRae was indicted on five criminal counts in the same indictment as Warren. Following the trial, the jury convicted him on Counts Four, Five, Six, and Seven for depriving Tanner of the right to be free from an unreasonable seizure by a law enforcement officer, in violation of 18 U.S.C. § 242, depriving Glover's descendants and survivors of the right to access courts to seek legal redress for a harm, in violation of 18 U.S.C. § 242, obstruction of a federal investigation, in violation of 18 U.S.C. § 1519, and use of fire to commit a felony, in violation of 18 U.S.C. § 844(h). The court sentenced McRae to concurrent 87 month sentences for his convictions under Counts Four, Five, and Six, and a consecutive 120 month sentence for his conviction under Count Seven. McRae timely appeals.

16

No. 11-30345

C.

1.

In December 2005, Sergeant Simmons prepared a police report addressing Glover's shooting. In preparing this report, Sergeant Simmons interviewed Warren and Officer Howard. Warren testified that he and Sergeant Simmons discussed what happened that day, which was then reflected in the typed narrative report. Her report contained multiple pages and attachments, some handwritten. The true contents of her report and the manner in which it was prepared are disputed.

According to the government, Sergeant Simmons alone prepared an authentic first report based on interviews that she alone conducted, and someone then replaced her report with a fraudulent second report written by McCabe. The first report was unfavorable to Warren: It contained statements from Officer Howard indicating that Warren was not justified in shooting Glover. It also contained a description of a bloody towel at the scene of the shooting that discredited Warren's insistence that his shot missed Glover. No hard copy of the first report exists. The second report, a copy of which does exist, omitted these details and also contained a review of the shooting by Lieutenant Italiano and Captain Kirsch, higher-ranking NOPD officials, exonerating Warren. The government theorizes that McCabe prepared the second report to cover up Warren's wrongdoing.

According to McCabe, no cover-up took place. The second report is not a second report at all, but rather the authentic report, which Sergeant Simmons prepared with his assistance. In assisting Sergeant Simmons in preparing the report, McCabe took part in the interview of Officer Howard, who never made the statements the government now attributes to her in the supposed first report. McCabe told this basic version of the events to the FBI during its investigation of Glover's shooting, and again to the grand jury.

17

No. 11-30345

2.

McCabe was indicted on three criminal counts in the same indictment as Warren and McRae. He was indicted on Counts Eight, Ten, and Eleven for obstruction of a federal investigation by falsifying a police report, in violation of 18 U.S.C. § 1519, making false statements to the FBI concerning the report, in violation of 18 U.S.C. § 1001, and making false statements to the grand jury concerning the report, in violation of 18 U.S.C. § 1623. The jury convicted McCabe on all three counts.

Following the trial of Warren, McRae, and McCabe, Warren's attorneys found a police report among the documents given to them by Warren to assist in the preparation of his defense. Importantly, the newly-discovered report was materially the same as the second, supposedly fraudulent report. Warren told his attorneys that Sergeant Simmons gave him this report in December 2005, at the time everyone agrees that Sergeant Simmons prepared a police report. Warren's attorneys notified McCabe's attorneys of the newly-discovered report, and McCabe then filed a motion for a new trial based on the existence of newly-discovered evidence.

The district court received arguments on the motion for a new trial and conducted an evidentiary hearing. At the hearing, Warren testified that Sergeant Simmons had given him this heretofore-unknown copy of the report in a private meeting in December 2005. He stated that he alerted his attorneys to its existence during the trial when he noticed minor differences between the report admitted into evidence and the report that he remembered being given by Sergeant Simmons. His attorneys, who did not think that the additional report had any bearing on his defense, did not locate the report until after the trial. Sergeant Simmons also testified at the hearing, and stated that she never provided Warren with a copy of any police report related to Glover's shooting. After reviewing the newly-discovered report and considering its impact on

18

No. 11-30345

McCabe's conviction, the district court concluded that the report supported McCabe's defense and badly undermined the government's theory. The court therefore granted McCabe's motion for a new trial in a sixteen-page order recounting these peculiar developments. The government timely appeals.

We exercise appellate jurisdiction over these appeals under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

We now turn to the arguments raised by the separate appellants, beginning with Warren. Warren argues that the district court erred in denying his multiple motions for severance based on misjoinder under Rule 8(b) and prejudicial joinder under Rule 14(a) of the Federal Rules of Criminal Procedure. He contends that the district court's denial of these motions constitutes reversible error.

## A.

First, Warren challenges the propriety of joining the charges against him with the charges against his co-defendants under Rule 8(b). "A claim of misjoinder is a matter of law that we review *de novo*, but we may affirm if we find that misjoinder occurred but that the error was harmless." *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009); *see also United States v. Maggitt*, 784 F.2d 590, 595 (5th Cir. 1986); *United States v. Manzella*, 782 F.2d 533, 540 (5th Cir. 1986). "Whether joinder is proper is normally determined from the allegations in the indictment." *United States v. Posada-Rios*, 158 F.3d 832, 862 (5th Cir. 1998) (citing *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994)).

Under Rule 8(b), two or more defendants may be charged in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "All defendants need not be charged in each

19

count." *Id.* As the plain language of Rule 8(b) provides, there is no requirement "that each defendant have participated in the same act or acts." *United States v. Krenning*, 93 F.3d 1257, 1266 (5th Cir. 1996). Here, there can be no dispute but that the allegations in the eleven counts of the second superseding indictment do not charge Warren and his co-defendants with participating in the same act or transaction. "All that is required," however, "is 'a series of acts unified by some substantial identity of facts or participants.'" *Id.* (quoting *United States v. Dennis*, 645 F.2d 517, 520 (5th Cir. Unit B 1981), *overruled on other grounds*, *United States v. Lane*, 474 U.S. 438 (1986)). "Whether the counts of an indictment fulfill the 'same series' requirement is determined by examining the relatedness of the facts underlying each offense." *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir. 1985) (internal quotation marks omitted). "When the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper." *Id.* at 1176-77 (internal quotation marks omitted). "When there is no substantial identity of facts or participants between the two offenses, there is no 'series' of facts under Rule 8(b)." *Id.* at 1177 (internal quotation marks omitted). Accordingly, for joinder of the defendants to be proper in the second superseding indictment, there must be some substantial identity of facts or participants between the offenses.

Warren contends that proper joinder of multiple defendants in an indictment requires a conspiracy charge to fulfill the "same series" requirement. The second superseding indictment does not, as Warren correctly points out, charge a conspiracy among Warren and his co-defendants. Warren thus maintains that he should not have been indicted with McCabe, who was indicted for fabricating the December 2, 2005 police report (favorable to Warren) in connection with the Glover shooting, or with McRae, who disposed of and burned Glover's body by burning Tanner's car on the levee. Although multi-defendant

and multi-offense indictments often charge a conspiracy among some or all defendants, we have rejected the contention that proper joinder of multiple defendants and multiple offenses requires a conspiracy charge. *Dennis*, 645 F.2d at 520. In *Dennis*, we stated that "[i]t is clear that the government need not allege a conspiracy in order to join defendants or counts." *Id.* Instead, "[w]hat is required is a series of acts unified by some 'substantial identity of facts or participants.'" *Id.* (quoting *United States v. Nettles*, 570 F.2d 547, 551 (5th Cir. 1978)).

As we have recounted several times, Counts One and Two charge Warren with offenses related to the single incident of Glover's shooting at the shopping center. Although the remaining nine counts clearly are temporally separate from that event, Warren's shooting of Glover was nevertheless the catalyst for the events that followed, which are charged in the other counts. Put another way, the allegations related to the Glover shooting in Counts One and Two connect Warren to the allegations against the other defendants in Counts Three through Eleven; indeed, those nine remaining counts mention the shooting and/or burning of Glover's body. The government would need to prove that Glover was shot in order to put Tanner and King, Tanner's car, and Glover's body at Habans Elementary School. Furthermore, the government would need to establish the circumstances surrounding Glover's shooting in order to prove that Italiano and McCabe engaged in an obstructive cover-up of the shooting. Thus, the charges in the indictment build upon one another: Warren shoots Glover; Glover is transported to Habans Elementary School, where NOPD officers are alleged to have beaten Tanner and King, and then disposed of Tanner's car and Glover's body by burning the car on the levee; and Italiano and McCabe are alleged to have obstructed the subsequent investigation into the shooting and to have made false statements in connection with the shooting. The fact that Glover was shot ties the allegations related to the shooting itself,

No. 11-30345

with the burning of Tanner's car and Glover's body, with the subsequent cover-up of the circumstances related to the shooting. In the light of the continuity of facts, therefore, we hold there was a series of acts unified by substantial identity of facts and joinder was proper under Rule 8(b). *Krenning*, 93 F.3d at 1266. The district court therefore did not err in denying the motion to dismiss based on improper joinder.

## B.

We are much more convinced that the district court erred in not granting Warren's motions to sever his trial from that of his co-defendants under Rule 14(a). We review the denial of a motion to sever for abuse of discretion. *Whitfield*, 590 F.3d at 355-56; *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007). To prevail, however, Warren must overcome significant obstacles. The federal judicial system evinces a preference for joint trials of defendants who are indicted together because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks omitted). It is the rule, therefore, not the exception, that "persons indicted together should be tried together, especially in conspiracy cases." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993). But at the same time, the Federal Rules of Criminal Procedure recognize that circumstances may be presented where the prejudice to a defendant from joinder with a co-defendant(s) in a joint trial overrules the interest in judicial economy. Rule 14(a) therefore provides, in relevant part: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Warren has not sat on his hands in this respect. He moved before, during, and at the conclusion of the evidence for severance under Rule 14(a), contending

that the spillover effect from the evidence presented in connection with his four co-defendants would deny him a fair trial. The district court was not receptive and denied each motion, opting instead to give the jury limiting instructions. The district court also denied his motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure based on the failure to sever. Warren continues to argue on appeal that the district court abused its discretion in refusing to sever his trial, recounting the substantial and compelling prejudice he suffered from the highly prejudicial and inflammatory evidence and testimony introduced in connection with the charges against the four other defendants that had little or no applicability to him.

Warren argues that, before the case was sent to the jury, crucial facts relevant to severance had become apparent: Up until the moment Warren encountered Glover and Calloway, he was dutifully performing his assignment of guarding a shopping center office, which contained police investigative files. He had not been involved in any conduct with the other officers on trial or with anyone else in unlawful or suspicious activity. After he shot Glover whom he thought to be a possibly armed looter, he continued to perform his guard duty, and he points out that he subsequently served as a police officer without blemish for two more years. He argues that he was unaware of and remained disassociated from the subsequent acts of the other co-defendant officers, who allegedly attempted to cover up facts related to the shooting. He further contends that there was a high risk that the jury would infer that he must have been guilty of a crime because of his fellow officers' attempt to cover it up or to obstruct its investigation. There was a substantial risk that if the jury found the other officers to have been guilty of cover-up crimes, it erroneously, and without supporting evidence, would also conclude that Warren had somehow participated with them, had received the benefit of their actions, and was therefore deserving of some level of punishment consistent with the other police officers' misconduct.

23

Our case law does not reflect a liberal attitude toward severance: "We will not reverse a conviction based upon denial of a motion to sever 'unless the defendant can demonstrate compelling prejudice against which the trial court was unable to afford protection, and that he was unable to obtain a fair trial.'" *Whitfield*, 590 F.3d at 356 (quoting *United States v. Massey*, 827 F.2d 995, 1004 (5th Cir. 1987)); *see also Mitchell*, 484 F.3d at 775 ("To demonstrate that the court abused its discretion in denying the motion for severance, 'the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection.'" (quoting *United States v. Morrow*, 177 F.3d 272, 290 (5th Cir. 1999)). "Severance is proper 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Mitchell*, 484 F.3d at 775 (quoting *Zafiro,* 506 U.S. at 539). "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). "A defendant is entitled to a reversal on this issue only if he identifies specific events during trial and demonstrates that these events caused him substantial prejudice." *United States v. Thomas*, 627 F.3d 146, 157 (5th Cir. 2010) (citing *United States v. Lewis*, 476 F.3d 369, 384 (5th Cir. 2007)); *see also United States v. Ellender*, 947 F.2d 748, 755 (5th Cir. 1991) ("Meticulous advocacy is required to isolate events occurring in the course of a joint trial and then to demonstrate that such events caused substantial prejudice."). Our review of the record convinces us that the facts in Warren's appeal fall within the relatively few cases in which this and other courts have held that severance was warranted.

24

No. 11-30345

In *United States v. Erwin*, 793 F.2d 656 (5th Cir. 1986), for example, we reversed the conviction of an appellant whose perjury charges were only peripherally related to a drug and racketeering conspiracy. *Id.* at 666. We determined that, as the trial progressed, very little of the "mountainous evidence," including evidence of two kidnappings, two beatings, and one killing, "was usable against her, and almost none of it applied directly." *Id.* We thus held that the prejudice from the joint trial "far outweighed" any benefit of judicial economy. *Id.* Here, the charge against Warren–that he acted unlawfully in shooting Glover–was only tangentially relevant to McRae's alleged ghoulish crime of obstruction related to Glover and the alleged cover-up charged against McCabe. Indeed, McRae and McCabe could have been convicted even if Warren had been found innocent, and as the trial progressed it became increasingly apparent that very little of the evidence of the alleged cover-ups was properly usable against Warren, and that almost none of it applied directly to him.

In *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998), we held that Rodriguez and Mata were entitled to a severance of their trial from seven others tried for offenses involved in a drug conspiracy. Although they had been part of the conspiracy initially, the record showed clearly that Rodriguez and Mata withdrew from the conspiracy in 1989, before a violent motorcycle gang, "the Bandidos," joined the conspiracy and later committed a drive-by shooting and other violence in Michigan as part of their collection efforts for the conspiracy. "Prejudice was found in that case because the defendants were never associated with the ["Bandidos"] gang, and because the evidence of the gang's activities was 'highly inflammatory' . . . ."*U.S. v. Bieganowski*,313 F.3d 264, 288 (5th Cir. 2002) (citing *Cortinas*, 142 F.3d at 438).

Similar to the situation in *Cortinas,* in Warren's trial, there was no evidence that he acted dishonestly or was in any way associated with the acts of his co-defendant officers in obstructing justice and covering-up evidence. He was

25

not charged with the alleged obstruction and cover-up crimes, but still he was required to sit before the jury while the emotion-charged testimony was unveiled to the jury and to hear his name bandied around the fringes of those offenses as part of the "Fourth District Fraternity" intent on protecting one of its own. With the similarities between Warren's case, *Erwin,* and *Cortinas* in mind, we proceed.

1.

To set the stage, we will review the charges and allegations against the defendants. Warren again reminds us that he was charged only in Counts One and Two of the second superseding indictment. The allegations in those counts *only* involved the shooting of Glover at the shopping center on the morning of September 2, 2005. Scheuermann (who was acquitted) and McRae were charged in Counts Three through Seven under the civil rights statutes for the beating of King and Tanner, the seizure of Tanner's car through burning, and the burning of Glover's body. For burning the car and Glover's body, they also were charged with obstructing the investigation into the Glover shooting and with the use of fire to commit civil rights deprivations and obstruction of justice. Next, Italiano (who was acquitted) and McCabe were charged in Counts Eight through Eleven with preparing and submitting a false narrative report with the intent to obstruct the federal investigation into Glover's shooting, with making false statements to the FBI during its investigation into the Glover shooting, and with making false statements to a federal grand jury concerning the allegedly false narrative report. Of significance to our consideration of Warren's argument is that the grand jury charged no conspiracy among the defendants to cover up Warren's role in Glover's shooting.

First, we consider the McCabe prosecution. To demonstrate compelling prejudice from the court's refusal to sever his trial, Warren points to the extensive evidence and testimony presented during the government's case

against McCabe concerning the allegedly false narrative report McCabe drafted. Warren argues that he was forced to stand trial on his charges against a backdrop of evidence related to a report that tended to exonerate him for shooting Glover, but which the government was contending was a made-up lie. In other words, he asserts that the failure to grant a severance resulted in his being tried for a "cover-up" investigation with McCabe.[7] Thus, he maintains there can be "no doubt" but that the jury made findings with respect to the falsity of the report—finding McCabe guilty of authoring and submitting the false report to obstruct the investigation into the Glover shooting, of making false statements to the FBI, and of making false statements to the grand jury—which spilled over into its determination of Warren's guilt or innocence on Counts One and Two.

Next, we look to the prosecution of McRae. Warren contends that he suffered specific and compelling prejudice from the ton of horrible evidence the government used to convict McRae, and that little of it was relevant to the indictment against him. Warren notes that Tanner's car and Glover's body were

---

[7] The government charged that McCabe had drafted his own sanitized, fraudulent version of the two-page narrative section of the December 2, 2005 police report and submitted that version as if it had been written by Sergeant Simmons. McCabe's version of the narrative section exonerated Warren and omitted the primary evidence the government sought to use against him: the inculpatory statements of Officer Howard, along with the so-called "bloody towel" that tended to disprove Warren's claim that he believed he had not hit anyone with his shot from the balcony that morning. McCabe's version of the report also contained a "fictitious review" of the incident by Italiano and Captain Kirsch that exonerated Warren in the shooting. The government thus contended at trial, and elicited testimony from Sergeant Simmons and Officer Howard, that Sergeant Simmons had authored an original version of the narrative section detailing the Glover shooting and that this original version accurately detailed the shooting with both Officer Howard's trial version and Warren's version of what had occurred that morning. The government elicited this testimony notwithstanding the facts that it could not actually produce Sergeant Simmons's original version of the report and that Sergeant Simmons could not explain how she came to have in her possession the second page of the allegedly fraudulent report–instead, the government permitted Sergeant Simmons to describe to the jury the information she had included in her original, unproduced version.

burned after the separate events pertaining to his conduct at the shopping center, and that the government introduced no evidence that Warren knew of the burning or that he ever communicated with McRae about destruction of the body as part of a cover-up. Warren nevertheless argues that at trial the government treated the counts against McRae as evidence of a cover-up, in which Warren was involved and guilty by association–he was a member of the "Fourth District Fraternity." Warren further points to the testimony and evidence presented (and later argued) by the government: the trauma suffered by Glover's family as they sought answers to his disappearance after he had been shot. Warren also points to the highly emotional and prejudicial photographs of Glover's burned body–the "bag of bones." Although the district court excluded some photographs after defense objections, Warren contends that the photographs of Glover's bones and skull were shown with testimony about how the skull later went missing from evidence. Warren also points to the inflammatory testimony elicited concerning the beating by white officers–McRae and Scheuermann–of King and Tanner, who are both black. The jury also heard testimony that, during the beatings, the two officers used degrading racial slurs toward King, Tanner, and Calloway. Even though Warren had no connection to these allegations, the government's evidence, he argues, compounded the racial aspect of his own case,[8] thereby further prejudicing the jury and conflating his conduct with culpable members of the Fourth District. Finally, Warren complains about adverse spillover from witnesses who testified during Italiano's defense, during McCabe's cross-examination, and during the government's rebuttal case.

In sum, Warren argues that the spillover effect from the cumulative evidence and testimony overwhelmed the jury's consideration of the simple issue

---

[8] Warren is white, while Glover was black. In addition, Officer Howard, Sergeant Simmons, and Officer Bell are black.

it had to decide in determining a verdict on Counts One and Two: whether Warren acted unlawfully when he shot Glover from the balcony of the shopping center.

The government responds that Warren was not tried for the criminal acts committed by the other defendants. It does not, however, address Warren's primary prejudice arguments; for example, the argument of prejudice resulting from being tried with a defendant who was indicted and being prosecuted for fabricating the police report almost completely favorable to Warren's version of the shooting.

We really do not view this question as close in view of how the trial of this case unfolded. First, we hold that Warren has met the difficult burden of showing that, as a result of the district court's refusal to sever his trial, he suffered compelling prejudice. During oral argument before this court, counsel for Warren suggested that, if Warren had been tried alone, the trial would have lasted three days, an approximation our review of the trial transcript confirms. Instead of a three-day trial focused only on evidence and testimony concerning the events underlying the allegations in Counts One and Two–whether Warren unlawfully shot Glover in the shopping center parking lot–Warren was subjected to sit before the jury for a trial lasting a month, in which sordid evidence and testimony was introduced about the beatings of King and Tanner at Habans Elementary School, the disposal and burning of Tanner's car and Glover's body; and, through the trial of McCabe relating to the cover-up of the Glover shooting through the alleged fabrication of the police report, in which the government sought to show that a report tending to exonerate Warren in the Glover shooting was a contrivance and fraud.

In evaluating the degree of prejudice inflicted by the joint trial, Warren was clearly prejudiced from the joint trial, to the extent that, we think, there may have been a different result if he had not been tried with McRae and

29

McCabe, even if such a result may not necessarily have been complete exoneration of all charges. Voluminous evidence and testimony was presented which, as a result of the joint trial, suggested that McCabe was in a conspiracy with Warren to exonerate Warren for his conduct on the morning of September 2, 2005. The narrative report McCabe was convicted of fabricating to obstruct the investigation into the Glover shooting tended to, if not fully exonerate Warren, minimize the wrongfulness of his conduct in shooting Glover.

Furthermore, notwithstanding that *no* conspiracy was charged among the defendants, our review of the record strongly suggests that the government was attempting to try the cases against each defendant as a whole piece, in effect a conspiracy, involving each of the defendants in a grand scheme in the Fourth District to engage in criminal conduct to protect Warren for his role in Glover's shooting. For instance, government counsel asked Warren during cross-examination if he knew that his transfer to the Fourth District had been made formal on December 2, 2005, the same date that appears on the report of the Glover shooting. Warren testified that he believed his transfer had been made effective prior to that date. Government counsel followed up with a series of questions–later sustained after Warren objected–about other officers, including McCabe, who had also received promotions in and around the time of December 2005. Extensive questioning then followed concerning the telephone call Warren received at the Royal Sonesta Hotel in November 2005 and whether Warren had been transferred to the Fourth District at the time he directed the caller to the Fourth District for further information about her son.[9] Warren testified that he

---

[9] Warren testified that, while working telephone duty at the NOPD command at the Royal Sonesta Hotel in November 2005, he received a phone call from a woman trying to locate her son. The woman said that her son had been shot near a Chuck E. Cheese restaurant on September 2 and taken to Habans Elementary School where there had been some problems. She also stated that his body had been placed in a car that was then burned on a levee. In response, Warren explained to her that she had not reached the Fourth District station and that, to obtain information, she should go in person to the Fourth District station and speak

recalled being transferred at some point earlier but was unaware of the administrative formalities of the transfer process. Government counsel then asked: "But in any event, by that point you were part of this 4th District Fraternity and you knew to keep your mouth shut about what Ms. Glover had told you?" Objections and a limiting instruction followed.

The most compelling prejudice, in our mind, resulted from the evidence, testimony, and photographs presented in connection with the government's case against McRae for the burning of Glover's body, all of which had an effect of associating Warren with the burning of Glover's body and subsequent cover-up. Especially troubling were the photographs of Glover's remains after they had been burned and the emotional testimony of Glover's family. Some of the evidence and testimony would have been inadmissible against Warren had he been tried alone,[10] and we are convinced that the severely emotional nature of the testimony and photographs prejudiced Warren. The government furthermore attempted, at various points, to subtly link Warren with McRae and the burning of Glover's body by presenting testimony that Warren had driven by Tanner's charred car on the levee in the weeks after the shooting. The argument for the irrelevance of this type of evidence in a case tried individually would have been much stronger. In sum, although "'the mere presence of a spillover effect does not ordinarily warrant severance,'" *United States v. McCord*, 33 F.3d 1434, 1452 (5th Cir. 1994) (quoting *Faulkner*, 17 F.3d at 759), in these circumstances,

---

with an officer there. He testified that he believed her story to be "fantastic," and that as a result, he thought she needed to speak with someone in person at the station. Warren did not report the phone call to anyone at the Fourth District. Warren did not learn or hear anything further about the woman who made the phone call, but the similarities between the time and place she described to him, aroused doubts whether he had missed the man with his shot on September 2, 2005.

[10] We decline to speculate which specific pieces of evidence would have been admissible at Warren's standalone trial.

No. 11-30345

we must conclude that Warren has cited specific and compelling instances of prejudice that resulted from joinder at trial with his co-defendants.

2.

Even though Warren has shown that, as a result of a joint trial, he has suffered compelling prejudice that resulted in an unfair trial, he also must demonstrate that the district court was unable to afford protection against the prejudice. *Mitchell*, 484 F.3d at 775. Warren acknowledges that, as a general proposition, limiting instructions are sufficient to cure prejudicial joinder, but contends that the instructions given by the district court here did not allow the jury to make a reliable judgment about his guilt because the jury was prevented from compartmentalizing the evidence to apply only to the culpable defendant. Further compounding juror confusion, the district court, in connection with the limiting instructions, made a series of rulings relating to contentious testimonial statements made by Warren admitted "not for the truth of the matter asserted." The government argues that the limiting instructions given by the district court at various points in the trial were sufficient to cure any prejudice.

The rule has been stated by the Supreme Court: "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211); *see also Faulkner*, 17 F.3d at 759; *Manzella*, 782 F.2d at 540; *Harrelson*, 754 F.2d at 1174-75. Here, however, we are unconvinced that limiting instructions did, or could have cured the prejudice of the spillover effect from the government's case against McCabe for the alleged cover-up or the voluminous testimony, and evidence the government presented in connection with McRae's burning of Glover's body. *See Cortinas*, 142 F.3d at 248. And as government counsel aptly demonstrated during closing arguments, it was easy to confuse the allegations against the defendants. In response to defense

No. 11-30345

argument that there was no forensic evidence to verify whether the pictures of Glover's wound[11] depicted an entry or exit wound, and whether a dark spot on his shirt was a bullet hole, government counsel stated during closing:

> So I wish I could tell that that dark spot was in fact a hole but I can't, and that's why the burning here is so pernicious and so evil because it denied justice and denied the Glover family the opportunity to do those kind [*sic*] of testing. And I wish it hadn't happened, but it did. And the defendants can't be like the Menendez brothers, okay, you remember them, you know, who killed their parents and then kind of cried and whined that they were orphans. All right. They can't say they don't have any forensic evidence and then go burn the body. That's ridiculous.

Warren's counsel quickly objected, arguing that Warren had not been charged in the counts concerning the burning of the body. Government counsel qualified his argument, stating that Warren "didn't have anything to do with the burning, okay, I am not suggesting that." But if the government could so nonchalantly group the defendants together, then we cannot be reasonably confident that the jury could compartmentalize the evidence separately for each defendant. *See United States v. Merida*, 765 F.2d 1205, 1219 (5th Cir. 1985) ("The test for severance under Rule 14 is whether the jury could sort out the evidence reasonably and view each defendant and the evidence relating to that defendant separately.").

We do not fault the district court for declining to sever Warren's case before trial, but as the trial progressed, however, and the evidence and testimony presented became irrelevant and unusuable against Warren, and increasingly inflammatory to him, we are of the belief that limiting instructions could not mitigate the prejudice. In particular, (1) the marginal relationship between the charge and the evidence against Warren and that against his co-

---

[11] Photographs of Glover's body–before it had been burned–lying face-down in the blood-covered backseat of Tanner's car were taken at Habans Elementary School and admitted into evidence.

defendants; (2) the significant difference between the simpleness of the underlying charges–essentially use of excessive force–against Warren, in the performance of his duty as a police officer, and the crimes alleged against his co-defendants involving dishonesty, corruption, obstruction and cover-up; (3) the highly inflammatory and prejudicial nature of the charges and evidence against the co-defendants, from which Warren was disassociated, involving the burning Glover's body in Tanner's car, the racially motivated beating of Tanner and King; and the alleged alteration and distortion of a police investigative report convince us that the district court abused its discretion.

Warren's case is one of those situations warranting a severance as opposed to the majority of cases that do not require severance because the inflammatory prejudice was not as great, e.g. *Bieganowski*, 313 F.3d at 288, or the difference between the types of crimes charged, on the one hand, and the related evidence, on the other, was not so great. We therefore hold that the district court abused its discretion in denying Warren's severance motion when it was reurged at the close of evidence. For the reasons given, Warren's convictions and sentences are vacated and the matter is remanded to the district court for further proceedings not inconsistent with this opinion.[12]

---

[12] Warren also challenges his convictions and sentence on various other grounds. He argues that the government's failure to disclose a crucial discrepancy in the testimony of a key government witness constituted reversible error under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Because we are remanding for a new trial, this argument is moot. In addition, he contends that the district court erred in giving the jury an instruction, over his objection, with respect to manslaughter under 18 U.S.C. § 1111 as it relates to his indictment under 18 U.S.C. §§ 924(c) and (j). The principle of double jeopardy, we note, prevents the government from retrying Warren on 18 U.S.C. § 924(j)(1)–as it is incorporated in the 18 U.S.C. § 924(c) charge–because the jury found that the death of Glover did not constitute murder as defined in 18 U.S.C. § 1111; instead the jury found it constituted manslaughter under 18 U.S.C. § 1112. Warren also maintains: that the district court erred in several of its evidentiary rulings; that the district court erred in holding that 18 U.S.C. § 924(c) applies to a law enforcement officer in the performance of his duties; and that the district court erred in holding that 18 U.S.C. § 924(j) requires a mandatory consecutive sentence. We pretermit consideration of these issues in view of the fact that Warren must be retried; any analysis and discussion would be dicta as unnecessary to resolve this appeal.

No. 11-30345

III.

We now turn to the arguments raised by appellant Gregory McRae. McRae was convicted on four criminal counts based on the conduct we have described: denying Glover's family access to courts, seizing Tanner's car, obstructing a federal investigation, and using fire to commit a felony.

A.

McRae was convicted under 18 U.S.C. § 242 for—in somewhat of an odd fit, given the gruesome circumstances of the crime—denying Glover's descendants and survivors the right of access to courts to seek legal redress for a harm. Under the same statute, he was convicted of using fire and a dangerous weapon during the commission of this offense. The statute provides, in pertinent part:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned . . . and . . . if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both . . . .

18 U.S.C. § 242. Of course, the civil right of access to courts is a well-established and fundamental right protected by the United States Constitution. *Ryland v. Shapiro*, 708 F.2d 967, 971 (5th Cir. 1983) (citing *Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907)). Thus, because the Constitution protects the right of access to courts, the plain language of § 242 suggests criminal liability for those who, under color of law, willfully deprive others of that right. 18 U.S.C. § 242.

35

The government's theory is that by burning Glover's body, McRae frustrated a lawsuit that Glover's family might have pursued to redress Glover's wrongful death or loss of constitutional rights.  McRae's conduct delayed the identification of Glover's remains and made it more difficult to discern the cause of his death, thereby denying Glover's family meaningful access to courts. McRae contends that the evidence is insufficient to support a conviction on this theory.  He points out that there was no denial of such a right because the government did not present evidence that any member of Glover's family, or anyone else, intended to bring a lawsuit or that any particular cause of action was available to a member of Glover's family.

McRae preserved his challenge to the sufficiency of the evidence in the district court through a motion for acquittal, and we therefore review de novo the district court's denial of his motion.  *United States v. Mitchell*, 484 F.3d at 768 (citing *United States v. Anderson*, 174 F.3d 515, 522 (5th Cir.1999)).  We will view the evidence in the light most favorable to the verdict and determine whether a rational jury could have found McRae guilty beyond a reasonable doubt based on the evidence presented.  *Id.*

Before reviewing the sufficiency of the evidence, however, we establish a background fact for our review: Although the right of access to courts is well established, vindicating that right through criminal prosecution is not.  The government has not been able in its appellate brief or oral argument to cite any other case in which a criminal defendant was charged under § 242 for denying access to courts.  The United States Department of Justice Civil Rights Division submitted a post-argument letter advising the Court that it "is aware of no other such prosecution."  We are left, therefore, in the uncomfortable position of reviewing a conviction under a novel theory of criminal liability, without precedent to light our way.

No. 11-30345

To the extent that it is relevant, we will draw on precedent in which individuals sought to vindicate the right of access to courts through civil actions. Under this line of precedent, two types of claims emerge:

> In the first are claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time. Thus, in . . . prison-litigation cases, the relief sought may be a law library for a prisoner's use in preparing a case, or a reader for an illiterate prisoner, or simply a lawyer. In denial-of-access cases challenging filing fees that poor plaintiffs cannot afford to pay, the object is an order requiring waiver of a fee to open the courthouse door for desired litigation . . . . In cases of this sort, the essence of the access claim is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed.
>
> The second category covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future. The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief . . . . These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future.

*Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002) (internal citation omitted).

We think that the government's theory in this case is most analogous to the second type, or backward-looking, claim. There is no prospective relief that

37

can undo the burning of Glover's body or provide clearer physical evidence on which to base a lawsuit. Any loss of access to courts in the instant case cannot be redressed by future official action.

To maintain a backward-looking claim, a plaintiff must identify (1) a nonfrivolous underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy that is not otherwise available in another suit that may yet be brought. *Id.* at 415. We think it is reasonable that if a civil claim requires proof bearing on these three elements, a criminal conviction requires at least as much. The government failed to present evidence to support these elements, and therefore McRae's conviction for this offense cannot stand.

The government failed to present evidence of a nonfrivolous underlying claim because it never identified an actual cause of action that an actual person lost. *Id.* at 418; *Lewis v. Casey*, 518 U.S. 343, 349 (1996). The government did not specify, in the second superseding indictment, which of Glover's descendants or survivors were denied access to courts, and what cause of action they lost. In a subsequent bill of particulars, the government stated that the relevant descendants or survivors included "any children, parents or siblings of Glover who would be eligible under state or federal law to file a claim" and that the causes of action "include, but are not limited to, wrongful death actions in state court and civil actions for deprivation of rights in federal court." Although the bill of particulars shed some insight on the government's theory of liability, it still did not identify a particular person or a particular cause of action.

The lack of clarity in the indictment carried forward into the government's presentation of evidence. The government never explained what it meant by a cause of action for the "deprivation of rights" or who had standing to pursue that nebulous cause of action. We can infer that the "wrongful death" action to which the government alluded is a wrongful death action under Louisiana state law, but again no evidence was presented as to who had standing to pursue the claim

38

or with respect to the elements necessary to support it. The failure to produce evidence of an actual cause of action that an actual person lost is critical because it makes it impossible to assess, as we must, whether the person's claim would be non-frivolous. *See Christopher*, 536 U.S. at 415. This defect is especially acute in the context of wrongful death, a statutory cause of action that strictly limits who may bring a claim based on who survives the deceased. La. Civ. Code Art. 2315.2.A.

Although the government's evidence introduced various of Glover's survivors—a sister, a mother, and a child, to name a few—it provided no indication that any survivor had any intention to sue. There is extensive evidence that Glover's family was concerned for him, and that they persistently sought information on what happened to him. But concern and persistence are not tantamount to a frustrated intent to sue. The jury cannot have rationally concluded that someone lost a claim without evidence that someone intended to bring a claim in the first place; or stated differently, the jury could not have rationally concluded that someone suffered a constitutional injury if he has not been harmed by the denial of a constitutional right he never asserted. Here for example, no person came to the door of the courthouse so no one was ever denied the constitutional right of entry.

Without presenting evidence of a nonfrivolous underlying claim, it was impossible for the government to then present evidence that the litigation of such a claim was frustrated or that the remedy that would accompany such a claim was irretrievably lost.

The only attempt that the government made to present evidence on these points was to jointly stipulate that the statute of limitations for a civil action under 42 U.S.C. § 1983 is one year from the date on which a plaintiff becomes aware of an injury. It is not clear what purpose this stipulation served. The government never identified anyone who intended to bring a claim under § 1983

or what, specifically, that person's claim would have been. Assuming that a particular family member had intended to bring a claim for excessive force under § 1983, it is not clear how the statute of limitations stood in that person's way. The evidence at trial indicated that Glover's family knew that he was a victim of a police shooting the day that he was shot. Glover's family was capable of knowing that Glover died from that shooting at least by the time that his remains were identified in April 2006. Although the government presented evidence that McRae's burning of Glover's body made it difficult to discern the precise cause of death, it presented no evidence that bringing a § 1983 claim would have been impracticable based on the evidence available through civil discovery. Perhaps the government feared that in arguing that it would be impracticable to prove a civil claim for an unjustifiable police shooting, it might contradict itself. After all, the government in this very case attempted to prove an unjustifiable police shooting beyond a reasonable doubt, while Glover's family member bringing a civil claim would only have needed to prove the same by a preponderance of the evidence.

To be clear, we take no position on whether McRae, in fact, prevented one of Glover's family members from bringing a § 1983 claim. We simply think that stipulating as to the statute of limitations for such a claim does not prove that the claim, and its accompanying remedy, was forever lost because of McRae's conduct.

We hold that the evidence is insufficient to support McRae's conviction for denying Glover's family members access to courts, and we therefore reverse his conviction on count five of the second superseding indictment.

### B.

McRae was also convicted under 18 U.S.C. § 242 for depriving William Tanner of his right to be free from an unreasonable seizure. He was convicted of using fire and a dangerous weapon during the commission of this offense.

No. 11-30345

Again, 18 U.S.C. § 242 prohibits the willful deprivation of constitutional rights under color of law. The right at issue for this conviction is the Fourth Amendment "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Importantly, the second superseding indictment charged McRae with seizing Tanner's car by burning it. McRae contends that he cannot have seized the car by burning it because the car had already been seized at that point: the car had been moved twice on the school property, and driven away from the school before it was burned. He argues that Tanner's possessory interest in the car had therefore already suffered meaningful interference. The government responds that the burning was merely the culmination of a course of conduct, all of which constitutes an unreasonable seizure.

McRae raises this argument for the first time on appeal, and we therefore review only for plain error. *United States v. Jasso*, 587 F.3d 706, 709 (5th Cir. 2009). Plain error review involves four prongs:

> First, there must be an error or defect. . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.' Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'

*United States v. Delgado*, 672 F.3d 320, 329 (5th Cir. 2012) (en banc) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (alterations in original).

No. 11-30345

Although McRae's position is eminently logical, we do not think that the district court, in entering judgment based on this conviction, committed any error that is beyond reasonable dispute. Assuming that it is error to regard the burning of the car as a seizure, the error is not plain because the law neither clearly nor obviously limits the meaning of seizure to the initial moment of dispossession.

McRae correctly observes that some circuits, with respect to the seizure of property, limit the meaning of seizure to initial dispossession. *See Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003); *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999); *United States v. Jakobetz*, 955 F.2d 786, 802 (2d Cir. 1992). But at least one other circuit defines the seizure of property more broadly, to include a course of conduct that interferes with possessory interests. *See Presley v. City of Charlottesville*, 464 F.3d 480, 487-89 (4th Cir. 2006). McRae does not point to any precedent in this circuit staking a position in this split, and we are not aware of any. "Because this circuit's law remains unsettled and the other federal circuits have reached divergent conclusions on this issue . . . [McRae] cannot satisfy the second prong of the plain error test—that the error be clear under existing law." *United States v. Salinas*, 480 F.3d 750, 759 (5th Cir. 2007).

With respect to seizures of the person, rather than property, the law is equally unclear, and the lack of clarity further undermines a contention of plain error in this case. We know that seizures of the person do not end at the initial moment of seizure. *See Graham v. Connor*, 490 U.S. 386, 394-96 (1989). How long the seizure of the person goes on, however, is not defined with precision in our circuit, and it is a question that divides other circuits. *See Brothers v. Klevenhagen*, 28 F.3d 452, 455-57 (5th Cir. 1994); *Valencia v. Wiggins*, 981 F.2d 1440, 1443-44 (5th Cir. 1993). The imprecision in describing the temporal quality of seizure in the context of seizures of the person discredits any

42

No. 11-30345

argument that it is clear or obvious that a seizure is over at the moment of initial dispossession in this context—that is, seizure of property.

We hold that it is neither clear nor obvious that McRae's burning of Tanner's car could not constitute an unreasonable seizure under the Fourth Amendment, and we therefore affirm his conviction under count four of the second superseding indictment.

C.

McRae was also convicted under 18 U.S.C. § 1519 for obstructing a federal investigation by burning Tanner's car, which contained Glover's body. The statute under which McRae was convicted provides as follows:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

McRae raises two challenges to this conviction, which we will consider separately.

1.

McRae first contends that the evidence is insufficient to support his conviction because although he admits to burning Tanner's car and Glover's body, the government presented no evidence that he knew that Glover had been shot by another police officer. This insufficiency is important, McRae argues, because if he did not knowingly destroy evidence of a police shooting, then he did not knowingly obstruct an investigation within the jurisdiction of federal authorities. The government points to evidence that suggests McRae may have

43

No. 11-30345

known that Glover was shot by another police officer. It also contends that even if McRae did not know that Glover was shot by a police officer, § 1519 still criminalizes his conduct because the federal nature of what the statute proscribes is only jurisdictional.

By framing this argument principally as a challenge to the sufficiency of the evidence, McRae invites us to skip past a threshold question of statutory interpretation: whether § 1519's requirement that a defendant act knowingly and with an obstructive intent—the statute's mens rea—applies to the federal nature of the investigation that the defendant obstructs. *See id.* If the statute does not require McRae to have known that the investigation he would obstruct would be a federal investigation, then there was no need for the government to present evidence on that point. If, in other words, the statute's mens rea does not apply to the federal nature of the investigation, then there is no reason for us to review the evidence on whether McRae knew that Glover had been shot by a police officer. We must therefore address the meaning of the statute first.

The problem for McRae is that he never argued in the district court that § 1519 requires knowledge or intent of the federal nature of the investigation obstructed. This point was never raised in his motions for acquittal or in his motion for a new trial. The most obvious way to raise the argument would have been by objecting to the jury instructions. But here again, McRae failed to make an argument about what § 1519 requires. Instead, he allowed the jury to be instructed as follows:

> The government is not required to prove that the defendant knew his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew the limits of federal jurisdiction. However, the government is required to prove that the investigation that the defendant intended to . . . obstruct . . . did, in fact, concern a matter within the jurisdiction of an agency of the United States.

44

No. 11-30345

Because McRae failed to object to this instruction, which is directly adverse to the argument he now advances on appeal, we review only for plain error.[13]  Fed. R. Crim. P. 30(d).  Although McRae may have preserved a challenge to the sufficiency of the evidence, he did not preserve this challenge concerning the meaning of the statute.  Essentially, his argument on appeal "is that there was insufficient evidence to convict him under the jury instruction that the court should have given," despite his acquiescence to the instruction the court actually gave.  *United States v. Fontenot*, 611 F.3d 734, 737 (11th Cir. 2010).  Under the circumstances, plain error is the appropriate standard of review.  *Id.*[14]  We will therefore reverse only if faced with an error that is so clear or obvious that it is not subject to reasonable dispute.[15]  *Delgado*, 672 F.3d at 329.

---

[13] In a post-argument letter, McRae's appellate counsel conceded that McRae "did not file objections to the district court's jury instruction[s] and did not file proposed instructions." McRae joined in the objections and instructions filed by his co-defendant, Dwayne Scheuermann, but Scheuermann did not challenge the district court's instructions with respect to § 1519.

[14] Although *Fontenot* was a case from the Eleventh Circuit, we note that the Supreme Court has stressed that plain-error review applies to "all" forfeited errors. *Puckett v. United States*, 556 U.S. 129, 136 (2009).  Additionally, there is no question that plain-error review applies to a failure to object to jury instructions.  *See* FED. R. CRIM. P. 30(d); *Johnson v. United States*, 520 U.S. 461, 465-66 (1997); *United States v. Betancourt*, 586 F.3d 303, 305-06 (5th Cir. 2009).  If a defendant could obtain de novo review of what *should have been* charged by challenging evidentiary sufficiency, he could work an end-run around forfeiture of a challenge to jury instructions. *Fontenot*, 611 F.3d at 737 ("Fontenot's [insufficiency] argument is, in essence, that there was insufficient evidence to convict him under the jury instruction that the court should have given.").

[15] McRae made a related argument in his post-verdict motions and in his appellate brief that because the Second Superseding Indictment stated that the investigation involved a shooting "by a . . . Police Department Officer" the government then had to prove that McRae knew that Glover had been shot by a police officer.  This argument is seriously flawed.

First, the argument came after the verdict, and after the jury had been instructed to the contrary.  Second, the requisite mens rea derives from the statute, not the indictment. McRae still has not contested the meaning of the statute.  Third, even if the mens rea derives from the indictment, the indictment merely states that the investigation McRae intended to obstruct involved a police shooting.  It takes a monumental leap to conclude that McRae had to know this detail, or other details, of the shooting to be guilty of obstructing an investigation into it.  If, for example, the indictment stated that McRae "intended to obstruct an

No. 11-30345

It is neither clear nor obvious that § 1519 requires that a defendant know that the investigation he obstructs will be a federal investigation. The statute prohibits knowingly destroying evidence "with the intent to impede, obstruct, or influence the investigation or proper administration of any matter *within the jurisdiction of any department or agency of the United States*." 18 U.S.C. § 1519 (emphasis added). On its face, § 1519 appears to make the relationship between the United States and the matter being obstructed a jurisdictional relationship. *Id.* This is significant in that the mens rea of a federal criminal statute does not ordinarily extend to the statute's jurisdictional elements. *United States v. Feola*, 420 U.S. 671, 677 n.9 (1975). The text of the statute, then, does not plainly support McRae.[16]

---

investigation into a shooting that occurred on Camp Street," it would be unreasonable to suggest that the government had to prove that McRae knew that the relevant shooting occurred on Camp Street. Fourth, the sentence in the indictment on which McRae bases his argument follows a sentence that charges McRae with the generic elements of § 1519. The sentence on which he bases his argument fleshes out the factual basis for the charge, whereas the preceding sentence fleshes out the legal basis. The factual basis is accurate: Glover was, in fact, shot by a police officer. In sum, McRae's argument concerning the indictment is not well-received and does not influence our analysis.

[16] The available legislative history further discredits McRae's position. Senator Leahy entered the following statement in the Congressional Record:

> Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation. The fact that a matter is within the jurisdiction of a federal agency is intended to be a jurisdictional matter, and not in any way linked to the intent of the defendant.

148 Cong. Rec. 14,449 (2002). The Senate Report is consistent with Senator Leahy's view:

> Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation.

S. Rep. No. 107-146, at 14 (2002). Based on this legislative history, it appears that Congress did not intend that a criminal defendant's knowledge or intent would have to extend to the

46

No. 11-30345

We are not aware of any United States Supreme Court or Fifth Circuit precedent addressing this issue, much less resolving the issue in McRae's favor. The Eighth Circuit, however, has concluded that "the term 'knowingly' in § 1519 modifies only the surrounding verbs" and that the matter obstructed need only be "within the jurisdiction of a federal agency as a factual matter." *United States v. Yielding*, 657 F.3d 688, 713-14 (8th Cir. 2011). The Eleventh Circuit, while disclaiming any holding regarding the actual requirements of the statute, has nonetheless concluded that it is "plausible" to read the language in § 1519 referring to federal agencies as "a simple jurisdictional element that operates independently of the defendant's intent or knowledge." *Fontenot*, 611 F.3d at 737.

In the light of the statute's text and the available precedent from other circuits, we hold that it is neither clear nor obvious that a defendant must know or intend that the investigation he obstructs be of a federal nature in order to be convicted under 18 U.S.C. § 1519. Even assuming the district court erred in its interpretation of the statute, it did not plainly err. For McRae, this means that he did not have to know that Glover had been shot by a police officer, and therefore that Glover's death might become the subject of a federal, rather than state, investigation.[17]

2.

McRae further contends that § 1519 is unconstitutionally vague. He argues that because the statute is ungrammatical, does not require obstruction of a pending or imminent investigation, and does not require a corrupt intent, it fails to provide fair notice of what conduct is prohibited. McRae further argues

---

federal nature of the matter being obstructed.

[17] McRae does not argue that he was unaware that Glover's body would be the subject of some kind of investigation. At trial, McRae testified that at the time he burned Glover's body, he thought that Glover was a homicide victim.

47

that the statute affords federal authorities discretion to prosecute innocent conduct.   The government responds that because § 1519 clearly prohibits McRae's conduct, he cannot complain of its vagueness.

McRae raises these arguments for the first time on appeal, and we therefore review for plain error.  *Jasso*, 587 F.3d at 709.  As explained above, we will reverse only if faced with an error that is so clear or obvious that it is not subject to reasonable dispute.  *Delgado*, 672 F.3d at 329.

The Fifth Amendment's Due Process Clause protects against criminal convictions based on impermissibly vague statutes.  *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010).  "'A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  A person whose conduct is clearly proscribed by a statute cannot, however, complain that the law is vague as applied to the conduct of others.  *Id.* at 2719 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).

McRae's argument concerning the vagueness of the statute's grammar is that the intent requirement—"intent to impede, obstruct, or influence"—applies to the object, "any matter within the jurisdiction of any department or agency of the United States," but does not apply to the later clause, "or in relation to or contemplation of any such matter or case."  18 U.S.C. § 1519.  Consequently, McRae argues, the statute criminalizes "knowingly . . . destroy[ing] . . . [a] tangible object . . . in relation to or contemplation of [a] matter or case," without any requirement of an obstructive intent.  *Id.*  Under this construction, a person could be convicted of obstructing justice without ever having intended to obstruct justice.

48

McRae is not the first person to notice § 1519's awkward wording. But other circuits, faced with the same argument, have construed the statute as criminalizing three circumstances involving a matter within the jurisdiction of a federal agency and a defendant acting with an obstructive intent: "(1) when a defendant acts directly with respect to the investigation or proper administration of any matter, that is, a pending matter, (2) when a defendant acts in contemplation of any such matter, and (3) when a defendant acts in relation to any such matter." *Kernell*, 667 F.3d at 753 (internal quotation marks and alterations omitted); *Yielding*, 657 F.3d at 711. This construction, which reads intent into every clause, is plausible and gives effect to the statute's language as a whole. Because the statute is reasonably susceptible to this construction, we do not think that it is so ungrammatical that the district court committed a clear or obvious error in this case.

McRae next argues that § 1519 is vague because unlike other obstruction of justice statutes, which require a "relationship in time, causation or logic" between the defendant's conduct and an investigation, § 1519 criminalizes the obstruction of contemplated investigations, which may happen in the distant future. *United States v. Aguilar*, 515 U.S. 593, 599 (1995). Because § 1519 does not appear to require the obstruction of a pending or imminent investigation, McRae argues that § 1519 might criminalize conduct with a highly tenuous connection to any investigation at all. The connection between the defendant's conduct and an investigation might be so remote in some cases that the statute punishes innocent conduct.

Although we are receptive to McRae's well-presented argument on this point, the potential for other hypothetical defendants to be punished for conduct remotely connected to an investigation is not a reason for overturning this particular conviction. In reviewing a statute for vagueness, we ask whether the statute gave the defendant fair notice that his conduct was prohibited. If the

49

statute notified McRae that his conduct was unlawful, he cannot complain about the notice it might provide to others. *Humanitarian Law Project*, 130 S. Ct. at 2719; *United States v. Mazurie*, 419 U.S. 544, 550 (1975); *Parker v. Levy*, 417 U.S. 733, 756 (1974).

McRae did not clearly or obviously lack notice that his conduct was unlawful. He knowingly burned the body of a homicide victim and must have realized that an investigation into that homicide would follow. McRae testified that he did not know exactly how Glover died, but he also testified that he thought that Glover was the victim of a homicide. As a police officer, there can be little doubt that McRae understood that Glover's body—that is, a homicide victim's body—would be the subject of an investigation. As fate would have it, the investigation that McRae obstructed was no ordinary homicide investigation, but instead a far-reaching federal investigation into alleged civil rights violations and an alleged police cover-up. But the fact that the actual investigation was not of the sort that McRae expected does not mean that the statute failed to notify him that burning a body violated its terms. McRae is unlike a hypothetical defendant who, for example, innocently shreds a document that ends up being implicated in a federal investigation years later. His speculation about the notice furnished to such a hypothetical defendant does not render § 1519 clearly unconstitutionally vague. *Humanitarian Law Project*, 130 S. Ct. at 2719.

McRae next argues that § 1519 fails to give adequate notice of the conduct prohibited because it does not require a "corrupt" intent, as other obstruction of justice statutes do. *Compare* 18 U.S.C. § 1519 *with* 18 U.S.C. §§ 1512(b), 1503. According to McRae, the absence of the word "corrupt" in § 1519 removes any requirement of knowing wrongdoing or evil intent, which is a fixture of obstruction of justice. *See Arthur Andersen, LLP v. United States*, 544 U.S. 696, 705-06 (2005).

No. 11-30345

Here again, McRae does not reveal clear or obvious unconstitutional vagueness. Although the statute may not require a "corrupt" intent, it still requires some form of obstructive intent, specifically a knowing destruction undertaken with the "intent to impede, obstruct, or influence the investigation or proper administration of [a] matter." 18 U.S.C. § 1519. At least one other circuit to consider the meaning of this language has suggested that there is "no dispute" that criminal liability under § 1519 requires some corrupt intent. *Kernell*, 667 F.3d at 754. In any event, due process does not require Congress to draft all obstruction of justice statutes uniformly, and we are unpersuaded that McRae lacked sufficient notice of the criminal state of mind described in § 1519.

McRae's last argument concerning vagueness is that because the statute is so broadly worded, it affords limitless discretion to federal authorities on what conduct to prosecute. He proposes that the statute might allow authorities to prosecute the well-intended destruction of contraband or the technically false completion of paperwork by a person assuming a new identity in a witness protection program. Because this argument is, again, based entirely on the effect that the statute may have on other, hypothetical defendants, we have no reason to consider it. *Humanitarian Law Project*, 130 S. Ct. at 2719.

We hold that § 1519 is not clearly or obviously unconstitutionally vague as it pertains to McRae.

3.

In sum, McRae's challenges to his conviction for obstructing a federal investigation fail because he fails to demonstrate plain error. In reviewing this particular conviction for plain error, we have not had occasion to make any holdings as to what § 1519 requires. We have simply held that the district court did not plainly err, and we affirm McRae's conviction on Count Six of the second superseding indictment for that reason.

51

No. 11-30345

D.

McRae was convicted under 18 U.S.C. § 844(h) for using fire to commit a felony. The indictment alleged that McRae used fire in denying Glover's family access to courts, seizing Tanner's car, and obstructing a federal investigation. The statute under which McRae was convicted provides as follows:

(h) Whoever--

(1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or

(2) carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,

including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years.

18 U.S.C. § 844(h).

The district court, applying § 844(h), sentenced McRae to 120 months of imprisonment to run consecutively with the 87 months imprisonment he received for his other convictions. McRae argues that the sentence imposed for his violation of § 844(h), to the extent that it is based on the felony of denying Glover's family access to courts or seizing Tanner's car, violates the Fifth Amendment prohibition on double jeopardy.[18] He argues that the convictions for denying access to courts and seizing the car would not have been felonies were it not for the use of fire, and that he cannot be punished twice for the mere use of fire. The government responds that McRae's sentence does not violate the prohibition on double jeopardy because Congress intended multiple punishments in this instance.

_____

[18] We will assume, as McRae does, that he could not be sentenced consecutively under 18 U.S.C. §§ 844(h) and 1519.

52

No. 11-30345

Our review is de novo. *United States v. Smith*, 354 F.3d 390, 398 (5th Cir. 2003) (citing *United States v. Kimbrough*, 69 F.3d 723, 728 (5th Cir.1995)).

The Double Jeopardy Clause of the Fifth Amendment provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "When a defendant challenges multiple punishments for the same conduct—rather than multiple prosecutions—our double jeopardy analysis turns on whether Congress has authorized the result at issue. If Congress has enacted statutes that separately punish the same conduct, there is no double jeopardy violation." *Smith*, 354 F.3d at 398 (citing *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983); *United States v. Prestenbach*, 230 F.3d 780, 782 n. 9 (5th Cir.2000)).

As an initial matter, we will disregard the conviction for denying access to courts for the purposes of our double jeopardy analysis. As explained above, the government failed to present sufficient evidence to support that conviction. Our focus is entirely on the government's use of the conviction for seizure of Tanner's car as a predicate felony to support the conviction for using fire during the commission of a felony under 18 U.S.C. § 844(h).

McRae's argument fails because Congress clearly intended to punish his conduct twice. First, using a dangerous weapon was sufficient to make the seizure of Tanner's car a felony, and to trigger enhanced punishment. 18 U.S.C. § 242. Second, Congress provided that § 844(h)'s ten-year imprisonment for using fire is "in addition" to punishment for a felony that provides an enhanced punishment for "use of a deadly or dangerous weapon." 18 U.S.C. § 844(h). Third, McRae did, in fact, use a dangerous weapon in seizing the car. The indictment charged both the use of fire and a dangerous weapon, and McRae admitted to using both. In his trial testimony, McRae stated that he lit Tanner's car on fire and used a gun to shoot out the car's back glass to assure the car's destruction. McRae's conduct would have been felonious based solely on the use

53

of the gun, and the government did not, therefore, exploit the mere use of fire to form a predicate felony and a conviction under § 844(h). We perceive no violation of the prohibition on double jeopardy.

Nonetheless, McRae argues that it is unclear whether the jury found that he used a dangerous weapon because the jury instructions required the jury to find the use of a dangerous weapon *or* fire, rather than the use of a dangerous weapon *and* fire. This argument lacks merit because McRae testified to using both fire and a dangerous weapon. In describing how he destroyed Glover's car, McRae testified as follows: "I fired one shot into the back rear glass, stood directly behind the vehicle, fired one shot into the rear glass, at which time the car began to burn." Although the jury may have returned a general verdict form that did not specify its findings, it is fanciful to suggest that the jury did not find facts that were never in dispute and to which McRae freely admitted. Even McRae's appellate brief recited the fact that he used both fire and a gun to destroy Tanner's car.

We therefore hold that McRae's punishment does not violate the prohibition against double jeopardy, and we affirm his sentence under count seven of the second superseding indictment.

## IV.

We now turn to the government's challenge to the new trial granted to Travis McCabe. McCabe was given a new trial after being convicted for obstruction of a federal investigation, making false statements to the FBI, and making false statements to a grand jury. The obstructive act McCabe is alleged to have committed is the creation of a false, second police report, to substitute for Sergeant Simmons's authentic first report. The false statements McCabe is alleged to have made to the FBI are that he assisted Sergeant Simmons in preparing a police report; that, in assisting Sergeant Simmons, he interviewed Officer Howard; and that the supposed second report was true and accurate. He

No. 11-30345

made the same statements to the grand jury, and also made the alleged false statement that he did not connect Warren's shooting and the burning of Tanner's car, despite his awareness of both, until he read about the connection between the events in the newspaper. At trial, the government supported its theory against McCabe primarily with the testimony of Sergeant Simmons[19] and Officer Howard, both of whom contradicted McCabe's recollection of the relevant events.

The post-trial discovery of another police report materially identical to the supposed second report, which Warren claims was given to him by Sergeant Simmons, persuaded the district court to order a new trial for McCabe. The government appeals the new trial order.

Upon a criminal defendant's motion, a district court may grant a new trial, "if the interest of justice so requires," including, in some circumstances, because of newly-discovered evidence. Fed. R. Crim. P. 33. To obtain a new trial based on newly-discovered evidence, a defendant must show:

> (1) that the evidence is newly discovered and was unknown to him at the time of trial; (2) that the failure to discover the evidence was not due to his lack of diligence; (3) that the evidence is not merely cumulative, but is material; and (4) that the evidence would probably produce an acquittal.

*United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004) (quoting *United States v. Gresham*, 118 F.3d 258, 267 (5th Cir. 1997)). The government disputes only the second and fourth factors here: McCabe's diligence and the probability of an acquittal.

---

[19] Sergeant Simmons testified that, during her initial grand jury testimony, she admitted that she had written the report shown to her in the grand jury–the "second report," which the government later charged McCabe with fabricating. After she left the grand jury that day, however, she contacted an attorney and subsequently returned to amend her grand jury testimony, asserting that the report she had been shown was not the report she had drafted and submitted in December 2005. At trial, however, Sergeant Simmons could not explain how she came to have in her possession in 2009 the second page of the "second report."

No. 11-30345

We review a district court's order granting a new trial for abuse of discretion. *United States v. Tarango*, 396 F.3d 666, 671 (5th Cir. 2005). As an appellate court, "we must not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence. Instead, we must [determine] whether . . . the district court's ultimate decision in granting or denying the motion for a new trial constituted a clear abuse of its discretion." *Id.* at 672 (internal citation omitted).

The government first argues that the district court abused its discretion because McCabe was not diligent in uncovering the newly-discovered report. McCabe understood the importance of rounding up any copies of the disputed police report, and because McCabe knew that Sergeant Simmons had interviewed Warren for the report, the government argues that he should have suspected Warren possessed a copy. Yet, McCabe's attorneys never asked Warren about the report or requested that Warren produce any documents.

The district court gave due consideration to this argument, and rejected it based on its own observations of the overall diligence exhibited by McCabe's attorneys throughout this case. In hindsight, if McCabe's attorneys had requested documents from Warren's attorneys, the newly-discovered report might have been available at trial. But diligence does not require perfect hindsight. In their pretrial investigation of this case, McCabe's attorneys had no reason to suspect that another copy of the disputed police report existed. McCabe's attorneys attempted to interview Sergeant Simmons before trial, where they might have inquired about whether she produced multiple copies, but they never received a response from Simmons's attorney. Under the circumstances, it appears that McCabe's attorneys acted diligently. We cannot fault them for failing to discover a document that got lost in the shuffle of an exceedingly complex case, especially where the district court's order commends the diligence of their overall efforts on McCabe's behalf.

56

The government next argues that district court abused its discretion because the newly-discovered report is unlikely to produce an acquittal. An acquittal is unlikely, the government argues, because the importance of the newly discovered report depends on the credibility of Warren, whom the government considers a liar and a felon. The newly-discovered report is only important if Sergeant Simmons prepared it, and the only evidence that Simmons prepared it is the post-trial testimony of Warren that he received the report from Simmons in a private meeting in 2005. If Simmons did not prepare the report, as she claims she did not, then it is simply another copy of a false report. The acquittal-producing potential of the report, then, depends largely on Warren's credibility.

Although the government acknowledges that this Court does not make credibility determinations in reviewing orders granting new trials, it urges this case as an exception. The government makes several arguments as to why an exception is warranted, but each argument is, in fact, a rather straightforward credibility attack. We decline the government's invitation to exceed our role by re-weighing Warren's credibility. The district court stated in its order granting a new trial that it faced the difficult task of weighing the testimony of two imperfect witnesses: Warren, whom the court had sentenced for a felony, and Sergeant Simmons, who had admitted to lying to a grand jury. In her initial testimony before the grand jury, Simmons claimed to have authored what she now says is a second report, but she recanted that story soon afterward. Ultimately, with the benefit of live testimony, the court concluded that Warren's post-trial testimony, at least, credibly demonstrated that Simmons delivered a copy of the disputed report to Warren. We will not disturb the court's careful balancing of a difficult credibility question.

The government next asks us to put aside the obstruction of justice conviction, and to consider that an acquittal is unlikely at least with respect to

the false statement convictions because not all of McCabe's false statements related to the falsification of a police report.  McCabe was also charged with lying to the FBI and grand jury about other things like, for example, whether he ever interviewed Officer Howard.  The government argues that the existence of another police report has no bearing on the truth or falsity of these other statements.

We reject this argument.  First, because the alleged false statements were lumped together in the indictment and the jury instructions, and because the jury returned a general verdict form, there is no way of knowing on which statements the convictions are based.  Second, the alleged false statements are mostly interrelated, and are bound together by the government's allegation that McCabe prepared a false police report.  The newly-discovered police report supports McCabe's entire defense, that is, that the supposed second police report is the authentic report, prepared by Sergeant Simmons and McCabe jointly under the circumstances described by McCabe.

In sum, the district court did not err in concluding that the failure to discover the police report in Warren's possession was not due to McCabe's lack of diligence and that the police report would probably produce an acquittal.  The government's arguments to the contrary are unavailing.  We therefore hold that the district court did not abuse its discretion in granting McCabe a new trial.

## V.

In this opinion, we have held that Warren was properly joined with his co-defendants in the indictment under Rule 8(b) but that the district court abused its discretion in denying his motion to sever his trial under Rule 14(a).  We therefore VACATE all his convictions and sentences and REMAND for further proceedings not inconsistent with this opinion.

With respect to McRae, we have held that the government presented insufficient evidence to convict McRae of denying Glover's descendants and

survivors the right of access to courts. We therefore REVERSE and VACATE his conviction on Count Five of the second superseding indictment. We also have held that the district court did not plainly err in entering judgment with respect to McRae's conviction for depriving Tanner of his right to be free from unreasonable seizure or with respect to his conviction for obstruction of a federal investigation. We therefore AFFIRM his convictions on Counts Four and Six of the second superseding indictment. Finally, we have held that McRae's 120-month sentence for using fire to commit a felony, which is to run consecutively with other sentences imposed, does not violate the Fifth Amendment's Double Jeopardy Clause. Nonetheless, because we are unsure of how the district court confected the various sentences as part of the whole, we VACATE all his sentences and REMAND for further proceedings not inconsistent with this opinion.

With respect to McCabe, we have held that the district court did not abuse its discretion in ordering a new trial in the light of newly-discovered evidence. We therefore AFFIRM the district court's order vacating McCabe's convictions and ordering a new trial.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.